FILED
2022 Aug-30  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KAYLA FLOYD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | |
| | } | **Case No.: 2:19-cv-01892-MHH** |
| **ADP LLC,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this employment action, Kayla Floyd asserts that her former employer, ADP LLC, violated Title VII when the company terminated her after she informed her supervisor that she was pregnant.  ADP contends that the employees who decided to terminate Ms. Floyd were not aware that she was pregnant when they made their decision.  ADP, in turn, contends that Ms. Floyd violated the non-solicitation and non-competition provisions in her restrictive covenant with ADP when she went to work for Paylocity, and ADP asserts a breach of contract claim against Ms. Floyd. Finally, Ms. Floyd contends that ADP filed its counterclaim as retaliation for her EEOC charge of discrimination against the company.

Ms. Floyd and ADP have filed cross motions for summary judgment on ADP's breach of contract counterclaim, and ADP has filed a motion for summary judgment on Ms. Floyd's Title VII claims. This opinion resolves these pending motions. The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment. Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted. Finally, the Court evaluates the evidence under the governing legal standards, considering first ADP's breach of contract claim and then Ms. Floyd's Title VII claims.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R.

CIV. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences from that evidence in favor of the non-moving party.  *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration."  *Alabama Municipal Ins. Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *Southern Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014)).  "Cross motions for summary judgment may be probative of the nonexistence of a factual dispute.  Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment."  *Shook v. U.S.*, 713 F.2d 662, 665 (11th Cir. 1983) (internal citation omitted).

## II.

"ADP, a human capital management firm, provides a range of business outsourcing and software services pertaining to human resources, payroll, taxes, and benefits administration to over 620,000 companies worldwide."  *ADP, LLC v.*

*Kusins*, 215 A.3d 924, 930 (N.J. Super. Ct. App. Div. 2019).  In 2013, ADP hired Ms. Floyd as an associate district manager.  (Doc. 68-1, p. 6, tp. 14).  Over time, ADP promoted Ms. Floyd to district manager for the Birmingham area.  (Doc. 68-1, pp. 6, 10, tpp. 14-15, 31).  In 2015, ADP promoted Ms. Floyd to senior district manager.  (Doc. 68-1, p. 6, tp. 15).  At ADP, associate district managers, district managers, and senior district managers are sales representatives.  (Doc. 68-1, p. 10, tp. 31).[1]  As a sales representative, Ms. Floyd targeted clients in Birmingham, Alabama.  (Doc. 68-1, p. 10, tp. 31).[2]

In 2017, ADP promoted Ms. Floyd to sales executive.  (Doc. 68-1, p. 6, tp. 15).  In her new position, Ms. Floyd supervised sales representatives and "help[ed] them [achieve] their goals."  (Doc. 68-1, p. 11, tp. 37).  Ms. Floyd also was involved in some "day-to-day sales activities."  (Doc. 68-1, p. 11, tp. 37).  Though she could not make a direct sale, Ms. Floyd helped sales representatives solicit new clients.  (Doc. 68-1, pp. 11-13, tpp. 37-42).  For example, Ms. Floyd called prospective clients on behalf of sales representatives to set up appointments and visited prospective clients in person.  (Doc. 68-1, pp. 11, 12, tpp. 37, 40).  As a sales executive, Ms. Floyd "managed the area from Shelby County [] all the way up to

---

[1] The duties of ADP sales representatives are the same, but the sales quotas for different sales representative positions vary.  (Doc. 68-1, p. 15, tpp. 50-51).

[2] ADP defines a sales representative's geographic territory by zip code.  (Doc. 68-1, p. 10, tp. 31).  Among others, Ms. Floyd was responsible for 35203, 35204, 35211, 35244, and 35218.  (Doc. 68-1, p. 10, tp. 31).

north Alabama, meaning Huntsville."  (Doc. 68-1, p. 11, tp. 36).  As a sales representative and as a sales executive, Ms. Floyd dealt with clients and prospective clients with between one and 49 employees.  (Doc. 68-1, p. 26, tp. 97).

While employed at ADP, Ms. Floyd had access to confidential and proprietary information such as pricing information, client information, and product information.  (Doc. 68-1, p. 16, tp. 57).  Ms. Floyd participated in meetings where ADP's marketing strategies and business plans were discussed.  (Doc. 68-1, p. 17, tp. 58).  Ms. Floyd attended ADP training sessions, including a week-long session for new hires.  (Doc. 68-1, p. 17, tpp. 60-61).

Because Ms. Floyd was a top performer, ADP awarded her restricted stock units in 2015, 2016, 2017, and 2018.  (Doc. 68-1, p. 9, tp. 29; Doc. 68-8, p. 2).  To receive the restricted stock units, Ms. Floyd accepted a restrictive covenant agreement.  (Doc. 68-8, pp. 15-23).  The restrictive covenant agreement contains the following non-competition and non-solicitation provisions:

> **4.      Non-Competition.**  I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use, disclose or disseminate ADP's Confidential Information or trade secrets.  However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive

investor, securities of any competitor of ADP which is listed on a national securities exchange.

**5.     Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.**

**a.     Clients:**     I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client:  (i) to whom ADP provides products or services and is located in a state in which I have performed services for ADP during the two (2) year period prior [to] the termination of my employment with ADP, (ii) to whom ADP has provided products or services within the one (1) year period prior to the termination of my employment with ADP and is located in a state in which I have performed services for ADP during the two (2) year period prior to the termination of my employment from ADP, (iii) whom I have solicited or contacted on behalf of ADP within the two (2) year period prior to the termination of my employment with ADP, or (iv) about whom I have any confidential, proprietary or trade secret information.  I also agree that I will not induce or encourage or attempt to induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship.

(Doc. 68-8, p. 18) (emphasis in Doc. 68-8).[3]  The restrictive covenant agreement

contains the following choice of law provision:  "The interpretation, validity, and

_____

[3] The following definitions are relevant to the non-competition and non-solicitation provisions quoted above:

**"Clients"** means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, and their employees or agents, or government or quasi-government entity, and their employees or agents, for:  (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP within the one (1) year period

prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; (iii) whom I have solicited, contacted, called upon, communicated with, or attempted to communicate with on behalf of ADP in connection with the Business of ADP within the two (2) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; or (iv) about whom I have any Confidential Information or trade secret information.

**"Competing Business"** means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of for, that is engaged in any business or enterprise that is the same as, or substantially the same as, that part of the Business of ADP in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product of service).

**"Confidential Information"** means information and the compilation of information known or possessed by me because of my employment at ADP that is created, compiled, received or gathered by ADP or its agents and is related to the Business of ADP, that is valuable to ADP, and which ADP endeavors to protect from disclosure or use by its competitors and others who could benefit from its use, whether written, tangible, electronic or any other form or media.  Assuming the foregoing criteria are met, Confidential Information includes but is not limited to information about:  ADP's operations, products, business plans, market strategies, and services; research and development of ADP products and services; ADP's intellectual property and trade secrets; Creative Works, including all publications, products, applications, processes, and software in any stage of development; names and other listings of current or prospective Clients, Business Partners, and Vendors (including contact information that may be compiled in computer databases that are not owned or controlled by ADP such as address books, personal digital assistants, smart phones, cloud storage services, and social and business websites); proposals made to current or prospective Clients, Business Partners, and Vendors or other information contained in offers or proposals to such Clients, Business Partners, and Vendors; the terms of any arrangements or agreements with Clients, Business Partners, and Vendors, including the amounts paid for such services or how pricing was developed by ADP, the implementation of Client-specific projects, the identity of Business Partners and Vendors, and Business Partner and Vendor pricing information, the composition or description of future services that are or may be provided by ADP; ADP's financial, marketing, and sales information; technical expertise and know-how developed by ADP, including the unique manner in which ADP conducts its business; employee lists, employee capabilities, employee compensation, prospective employee information, and employee training information and practices; Personally Identifiable Information; and Protected Health Information.  Confidential Information also includes any information

7

enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of law principles that require the application of the law of another jurisdiction, to the extent permitted by the law." (Doc. 68-8, p. 20).

On January 9, 2019, Associate Relations – ADP's human resource's employee investigations department – opened an investigation into Ms. Floyd. (Doc. 77-2, p. 2). Erica Ontiveros was assigned the roles of "Lead Investigator" and "Decision Maker." (Doc. 77-2, p. 2). Ms. Ontiveros explored seven issues arising out of complaints made against Ms. Floyd:

1. Did Kayla Floyd reveal her breast to a direct report during a team off-site event?

2. Has Kayla Floyd directed her associates to upgrade a sold deal on the [sales order] without the client's knowledge?

---

disclosed to ADP by a third party (including, without limitation, current or prospective Clients, Business Partners, and Vendors) that ADP is obliged to treat as confidential. This definition of Confidential Information excludes information that is or becomes known or generally available in the public domain through lawful means, other than through my act or failure to act. This definition of Confidential Information and the use of the term Confidential Information in this Agreement are not meant to limit ADP's rights under applicable trade secrets laws, and ADP specifically reserves all of its rights under all applicable laws concerning trade secrets.

. . .

**"Territory"** means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

(Doc. 68-8, pp. 16, 17) (emphasis in Doc. 68-8).

3.  Has Kayla Floyd instructed her direct reports to use white out on [sales orders] to correct information that was filled out incorrectly?

4.  Has Kayla Floyd engaged in bullying type behaviors by singling out associates and questioning them as to who is complaining about her and demanding to know the names of the complainants?

5.  Has Kayla Floyd [] created an environment of favoritism by inviting the same 3 direct reports to her lake house and leaving work several times/week to workout with one direct report during work hours?

6.  Has Kayla Floyd publicly mocked several associates in team meetings and in 1:1 settings?

7.  Has Kayla Floyd demonstrated behaviors of being intoxicated at two team offsite events in front of her direct reports and possibly her immediate leader?

(Doc. 77-2, p. 2).  Ms. Ontiveros and her team interviewed Ms. Floyd, Casey Fischer (Ms. Floyd's direct supervisor, Vice-President of Sales for the Tennessee Region), and five sales representatives who reported to Ms. Floyd.  (Doc. 77-2, p. 3).

At the conclusion of the investigation, Ms. Ontiveros reached the following factual conclusions:  as to Issue 1, "[u]nable to substantiate" that Ms. Floyd revealed her breast to a direct report during a team off-site event, (Doc. 77-2, p. 6); as to Issue 2, "[u]nable to substantiate" that Ms. Floyd directed her associates to upgrade a sold deal on a sales order without the client's knowledge, (Doc. 77-2, p. 6); as to Issue 3, Ms. Ontiveros substantiated that Ms. Floyd instructed her direct reports to use white out on sales orders to correct information that was completed incorrectly, (Doc. 77-

2, p. 7);[4] as to Issue 4, three witnesses stated that Ms. Floyd "used intimidation tactics" to determine who was complaining about her, (Doc. 77-2, p. 7); as to Issue 5, five witnesses confirmed that Ms. Floyd created an environment of favoritism by inviting the same three direct reports to her lake house and leaving work several times a week to workout with one direct report during work hours, (Doc. 77-2, pp. 7-8); as to Issue 6, Ms. Ontiveros substantiated through witness corroboration that Ms. Floyd mocked two associates, (Doc. 77-2, p. 8); and as to Issue 7, based on her interviews, Ms. Ontiveros "strongly suspected" that Ms. Floyd demonstrated behaviors of being intoxicated at two team off-site events in front of direct reports, (Doc. 77-2, p. 8).

During the week of March 4, 2019, Ms. Ontiveros met with HR Business Partner Adrienne Dollins and Divisional Vice-President David Cramer and recommended that ADP terminate Ms. Floyd.  (Doc. 68-2, pp. 14, 15, 17, tpp. 45, 46, 54).  Ms. Dollins and Mr. Cramer supported Ms. Ontiveros's recommendation, and they jointly decided to terminate Ms. Floyd.  (Doc. 68-2, p. 17, tp. 54).  No evidence in the record suggests that Ms. Ontiveros, Ms. Dollins, or Mr. Cramer knew that Ms. Floyd was pregnant when they decided to terminate her.

---

[4] In her deposition, Ms. Floyd testified that it was common practice at ADP to use white out on sales orders to correct typographical errors.  (Doc. 68-1, p. 21, tp. 77).  According to Ms. Floyd, ADP's implementation team instructed ADP employees to use white out for this purpose.  (*See e.g.*, Doc. 68-1, p. 21, tp. 77).  For purposes of this opinion, the Court accepts Ms. Floyd's testimony.

On March 11, 2019, at approximately 11:00 a.m. CST, Associate Relations informed Mr. Fischer that ADP had decided to terminate Ms. Floyd.  (Doc. 68-4, p. 16, tp. 79).   Associate Relations told Mr. Fischer that he "needed to be in the Birmingham office as soon as possible to be the person that essentially walked [Ms. Floyd] out of the building when they finalized her termination."  (Doc. 68-4, p. 16, tp. 79).  Associate Relations told Mr. Fischer that "the reason [Ms. Floyd] was being terminated was for authorizing and advising a sales associate to use white[]out on a legal sales document."  (Doc. 68-4, p. 18, tp. 86).  At the time, Mr. Fischer did not know that Ms. Floyd was pregnant.

Later that afternoon, Ms. Floyd called Mr. Fischer and told him that she was pregnant.  (Doc. 68-4, p. 17, tpp. 80-81).  Immediately afterwards, Mr. Fischer informed Mr. Cramer that Ms. Floyd was pregnant.  (Doc. 68-4, p. 18, tpp. 86-87). Either that night or the next morning, Mr. Cramer called Mr. Fischer and told him that he "still needed to get to Birmingham as soon as possible to be there when Associate Relations follows through with the termination."  (Doc. 68-4, p. 19, tp. 88).

On March 13, 2022, Ms. Ontiveros met with Ms. Floyd over Skype.  (Doc. 68-1, p. 20, tp. 72).  During that meeting, Ms. Ontiveros confronted Ms. Floyd with evidence that she had instructed a subordinate to white out a sales document and informed Ms. Floyd that she was terminated.  (Doc. 68-1, pp. 20-21, tpp. 73-74).

Mr. Fischer helped Ms. Floyd collect her personal belongings and escorted her out of the building.  (Doc. 68-4, p. 19, tpp. 90-91).

On April 22, 2019, Ms. Floyd began working for Paylocity.  (Doc. 68-1, p. 25, tp. 93).  Paylocity provides HR and payroll software for employers.  PAYLOCITY, http://www.paylocity.com (last visited Aug. 16, 2022).   Ms. Floyd is an HCM account executive with Paylocity.  (Doc. 68-1, p. 26, tp. 96).  As an HCM account executive, Ms. Floyd must "bring on new clients in the major market space," which comprises businesses with 50 to 500 employees.  (Doc. 68-1, p. 26, tp. 96).  Her geographic territory is Eastern Alabama.  (Doc. 68-1, p. 49, tp. 188).  Some of the cities within Ms. Floyd's territory are Pell City, Gadsden, Heflin, Anniston, Wedowee, Roanoke, Fruithurst, Odenville, and parts of Birmingham (namely, Leeds).  (Doc. 68-1, p. 49, tpp. 188-89).  Ms. Floyd acknowledges that there is some overlap between her ADP sales territory and her territory as an HCM account executive at Paylocity.  (Doc. 68-1, p. 65, tp. 251).[5]

### III.

### *ADP's Breach of Contract Claim*

Ms. Floyd argues that the non-competition and non-solicitation provisions in the ADP restrictive covenant agreement that she accepted are unenforceable.  (Doc.

---

[5] According to Ms. Floyd, though the two territories overlap in certain respects, "they are not areas that [she] specifically sold in" while she worked for ADP.  (Doc. 68-1, p. 65, tp. 251).

84, p. 17). Ms. Floyd asserts that "in this circumstance, with the purported application of the contract, the restrictive covenant would be unduly burdensome" on her. (Doc. 84, p. 17). Ms. Floyd argues that if ADP's restrictive covenant is enforceable against her, she did not violate it.

Under New Jersey law, a restrictive covenant generally is reasonable "where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Solari Industries, Inc. v. Malady*, 264 A.2d 53, 56 (N.J. 1970).[6] To determine the enforceability of a restrictive covenant, a court must "balance the employer's need to protect its legitimate interests against the hardship placed on the employee by the agreement." *Kusins*, 215 A.3d at 943 (citing *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (NJ. 1988)).

> An employer's legitimate interests include the protection of trade secrets or proprietary information, as well as customer relationships. *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33, 274 A.2d 577 (1971). It also includes the protection of information that, while not a trade secret or proprietary, is nonetheless "highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment." *Ingersoll-Rand Co.*, 110 N.J. at 638, 542 A.2d 879.

---

[6] The parties do not contest the validity of the New Jersey choice of law provision in ADP's restrictive covenant. (Doc. 68-8, p. 20). Accordingly, the Court applies New Jersey substantive law in evaluating ADP's breach of contract claim.

With that said, an employer does not have a legitimate interest in simply preventing competition. *See Whitmyer Bros.*, 58 N.J. at 35, 274 A.2d 577. Consequently, "[c]ourts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee." *Ingersoll-Rand Co.*, 110 N.J. at 635, 542 A.2d 879.

. . .

In weighing the hardship placed on an employee by an RCA, a court must determine "the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee." *More*, 183 N.J. at 59, 869 A.2d 884. Therefore, "the geographic, temporal, and subject-matter restrictions of an otherwise enforceable [RCA] will be enforced only to the extent reasonably necessary to protect the employer's legitimate business interests." *Campbell Soup Co. v. Desatnick*, 58 F.Supp.2d 477, 489 (D.N.J. 1999) (citing *Foti*, 253 N.J. Super. at 634, 602 A.2d 789).

*Kusins*, 215 A.3d at 943-44. Ultimately, a court may determine that it cannot enforce a restrictive covenant or a court may give a restrictive covenant "'total or partial enforcement to the extent reasonable under the circumstances.'" *Kusins*, 215 A.3d at 944 (quoting *Whitmyer*, 58 N.J. at 32, 274 A.2d 577). In cases of partial enforcement, a court may "'blue-pencil' the application of an RCA in terms of the geographical area, period of enforceability, and scope of prohibited activity." *Kusins*, 215 A.3d at 944 (citing *Solari*, 264 A.2d at 61; *Campbell Soup Co.*, 58 F.Supp.2d at 489).

Applying the *Solari* factors here and beginning with ADP's interests, the appellate court in *Kusins* found that ADP has "a legitimate and protectable interest in its customer relationships sufficient to justify enforcement of its [restrictive

covenant agreement]." *Kusins*, 215 A.3d at 945.[7]  Ms. Floyd does not challenge ADP's assertion that the restrictive covenant agreement protects ADP's legitimate interests, and she does not argue that enforcement of the restrictive covenant agreement would harm the public.[8]  Instead, Ms. Floyd argues that enforcement of the restrictive covenant agreement would impose an undue hardship on her.  (Doc. 84, pp. 17-18).

Naturally, restrictive covenant agreements "impose a degree of hardship on employees who leave ADP and work in the same field for another company," but courts "must determine whether that hardship is undue."  *Kusins*, 215 A.3d at 946. When examining hardship, a court must consider the circumstances surrounding the departure of the employee who allegedly has violated a non-compete obligation.

If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the

---

[7] The *Kusins* court stated:

ADP's business is providing services to its clients.  Protecting its customer relationships is paramount to its success. We are satisfied ADP has presented ample evidence that acquiring and retaining its customers requires "a significant investment of time, effort and money which is worthy of protection."

*Kusins*, 215 A.3d at 945 (quoting *A.T. Hudson & Co. v. Donovan*, 524 A.2d 412, 416 (N.J. Super. Ct. App. Div. 1987)).  As noted, while she worked for ADP, Ms. Floyd had access to ADP pricing information, client information, product information, marketing strategies, and business plans. (Doc. 68-1, pp. 16-17, tpp. 57-58)

[8] Neither party has discussed the third *Solari* factor, harm to the public.  Because ADP seeks to enforce its restrictive covenant in Alabama, the Court notes that until 2016, under Alabama law, "[c]ontracts restraining employment" were statutorily limited because "they tend not only to deprive the public of efficient service, but tend to impoverish the individual."  *Central Bancshares of the South, Inc. v. Puckett*, 584 So. 2d 829, 830 (Ala. 1991) (citing Ala. Code § 8-1-1).

> position of bringing the restriction into play. On the other hand, where
> the employer causes the parties to separate, enforcement of the
> covenant may cause hardship on the employee which may fairly be
> characterized as undue in that the employee has not, by his conduct,
> contributed to it.

*The Community Hosp. Group, Inc. v. More*, 869 A.2d 884, 898 (N.J. 2005) (internal

quotation marks and citations omitted).  Here, though Ms. Floyd did not terminate

her relationship with ADP, the Court cannot say that Ms. Floyd did not, "by [her]

conduct, contribute[] to" her separation from ADP.  *More*, 869 A.2d at 898.

Factually, this case resembles *ADP, LLC v. Olson*, No. 20-03312 (KM) (JBC),

2020 WL 6305554 (D.N.J. Oct. 28, 2020).  In *Olson*, an employee

"resigned . . . allegedly to avoid answering ADP's questions about his purported

fraudulent conduct."  *Olson*, 2020 WL 6305554, at *6.  Mr. Olson and Ms. Floyd

both allegedly violated ADP rules, and those violations caused their separation from

ADP.[9]  In *Olson*, the district court found that ADP's restrictive covenants, "as blue

penciled above, [were] reasonable and enforceable against" the employee.  *Olson*,

2020 WL 6305554, at *11.

In determining whether ADP's restrictive covenant placed an undue burden

on Ms. Floyd, the Court considers not only the circumstances of her departure but

---

[9] As noted, Ms. Floyd challenges ADP's criticism of her work as it relates to the use of white out
on client documents.  As to ADP's motion for summary judgment on its breach of contract claim,
the Court accepts Ms. Floyd's position.  But the record indicates that ADP's investigation of
complaints against Ms. Floyd yielded several bases for action against her including evidence that
she mocked employees who reported to her, and she favored some employees who reported to her
over others.

also "the likelihood of" Ms. Floyd "finding other work in [] her field, and the burden the restriction place[d] on" Ms. Floyd. *More*, 869 A.2d at 898. With respect to other work, in her declaration, Ms. Floyd explained that after she left ADP, she worked with a recruiter and received two job offers, one from Paychex, Inc. and the other from Paylocity. (Doc. 71-1, p. 4, ¶¶ 11-12). She received both offers within six weeks of her separation from ADP. (Doc. 68-1, pp. 20, 25, tpp. 72, 93). She accepted the Paylocity offer rather than the Paychex offer because her responsibilities with the job Paychex offered were "arguably too similar" to her responsibilities with ADP and might violate ADP's restrictive covenant. (Doc. 71-1, p. 4, ¶ 12). With respect to burden, the non-compete and non-solicitation provisions in ADP's restrictive covenant lasted 12 months, so the burden on Ms. Floyd's work for Paylocity was limited in time. By the time Ms. Floyd joined Paylocity, she had approximately 10.5 months remaining in which she had to operate under the restrictions in her agreement with ADP.

Per *Kusins*, ADP has a legitimate and protectable interest in its customer relationships sufficient to justify enforcement of its restrictive covenant, and per *Olson*, viewing the evidence in the light most favorable to ADP with respect to Ms. Floyd's motion for summary judgment, Ms. Floyd put herself in the position of having the restriction come into play. Though it may have been difficult for Ms. Floyd to have to avoid certain areas of Alabama for a little over 10 months, on the

record in this case, the Court finds that a limited restrictive covenant would not impose an undue hardship on her.  As in *Kusins* and *Olson*, the non-competition and non-solicitation provisions in ADP's restrictive covenant agreement are overly broad but are enforceable with blue-penciling.  Under New Jersey law, in the 12 months following Ms. Floyd's departure, ADP could properly restrict her from having "dealings with existing ADP clients that [she] was actively involved with or whose names [she] learned during [] her employment," but because of the breadth of ADP's business, she "could not possibly know all of ADP's actual clients," and therefore could not be foreclosed from contacting all ADP customers.  *Kusins*, 215 A.3d at 946.  ADP could "restrict [Ms. Floyd], for a reasonable time, from providing services to [Paylocity] in the same geographic territory in which [Ms. Floyd] operated while at ADP."  *Kusins*, 215 A.3d at 929.

With those parameters in mind, the Court considers Ms. Floyd's argument that she did not violate the non-competition and non-solicitation terms of ADP's restrictive covenant during the first 10.5 months she worked at Paylocity.  With respect to the non-competition provision, it is undisputed that ADP and Paylocity compete with one another; both provide human resources and payroll software for businesses.  Because ADP and Paylocity compete for customers, to establish a violation of the non-competition provision in its restrictive covenant, ADP must demonstrate that during her first 10.5 months with Paylocity, Ms. Floyd worked in

her previous territory and provided services to Paylocity like those she provided to ADP.

Ms. Floyd argues that the territory in which she worked changed when she joined Paylocity, (Doc. 84, p. 9), but in her deposition, Ms. Floyd admitted there was some overlap between her territory as a sales executive at ADP and her territory as an HCM account executive at Paylocity, (Doc. 68-1, p. 65, tp. 251). Ms. Floyd argues that she did not sell products in areas of her Paylocity territory that overlapped with her ADP territory, (Doc. 84, p. 9), but that is a mitigation of damages argument. Liability for a violation of her agreement with ADP does not turn on sales but on work in overlapping territories. Partial overlap in Ms. Floyd's initial Paylocity territory and her former ADP territory is sufficient for liability to attach. *See Kusins*, 215 A.3d at 949.

Ms. Floyd also argues that the services she provided to Paylocity in her first 10.5 months of employment with the company were different from the services she provided to ADP. (Doc. 84, pp. 9-10).[10] Ms. Floyd identifies three differences between her employment with Paylocity and her employment with ADP: she targets

---

[10] ADP's second request for admission states: "Admit you are currently employed by Paylocity in a capacity which is the same or similar to the capacity in which you were employed with ADP." (Doc. 68-7, p. 4). Ms. Floyd's response was "Admitted." (Doc. 68-7, p. 4) (emphasis omitted). Based on Ms. Floyd's response, ADP asks this Court to find that Ms. Floyd has admitted that the services she provides to Paylocity are the same or substantially similar to the services she provided to ADP. The Court will consider the admission but test it against evidence concerning the details of Ms. Floyd's job responsibilities. The conclusory question that ADP asked Ms. Floyd produced a conclusory admission that is minimally helpful in the Court's analysis.

larger clients for Paylocity; she targets different types of businesses for Paylocity; and she sells different products for Paylocity.  (Doc. 84, p. 2).

Under New Jersey law, the size of the companies that Ms. Floyd pursues as customers is not relevant to her performance of her obligations under ADP's restrictive covenant.

> The specialized training and confidential information [the employee] acquired from ADP was useful to [the employee] in [the employee's] dealings with any potential client, regardless of the company's number of employees. The non-compete provision was intended to protect all of ADP's customer relationships in the geographical area in which its former employees had worked.

*Kusins*, 215 A.3d at 949.  For purposes of this opinion, the Court accepts Ms. Floyd's assertion that, as a sales executive at ADP, she recruited clients with between one and 49 employees, and as an HCM account executive at Paylocity, she targets clients with between 50 and 500 employees.  (Doc. 68-1, p. 26, tpp. 96-97).  The problem, of course, is that Ms. Floyd has not established that ADP never provided products or services to companies with more than 50 employees; she simply has described the scope of her responsibilities as one of many ADP sales executives.  ADP's restrictive covenant prohibits her from soliciting any ADP customer in an overlapping territory, not just customers who she previously served.

This analysis applies equally to Ms. Floyd's argument that she does not provide the same or substantially similar services because she targets different types of businesses.  While at ADP, Ms. Floyd had access to confidential and proprietary

information, (Doc. 68-1, p. 16, tp. 57), she participated in meetings where ADP's marketing strategies and business plans were discussed, (Doc. 68-1, p. 17, tp. 58), and she attended various ADP training sessions, (Doc. 68-1, p. 17, tpp. 60-61). Just as the specialized training and confidential information that Ms. Floyd acquired from ADP positioned her to potentially disrupt ADP's customer relationships in the overlapping territories if she tried to develop relationships with ADP's larger customers, she also may disrupt ADP's customer relationships in the overlapping territories with all businesses that ADP serves or pursues. The non-competition provision is designed to protect against both potential occurrences.

Ms. Floyd's argument concerning differences in products fares somewhat better. As a sales executive with ADP, Ms. Floyd sold "payroll and tax filing solutions." (Doc. 71-1, p. 5, ¶ 13). As an HCM account executive with Paylocity, Ms. Floyd sells "Human Resource Information System[s]." (Doc. 71-1, p. 5, ¶ 13). The parties have not provided evidence to help the Court understand possible overlap between the products or the extent to which Ms. Floyd's training at ADP might equip her to sell "Human Resource Information System[s]."[11]   Thus, the Court cannot

---

[11] Mr. Fischer stated broadly in his affidavit that in her sales positions, Ms. Floyd was responsible for selling ADP products and services including "human resources management, and other human capital management tools to employers." (Doc. 68-5, p. 2, ¶ 4). For purposes of ADP's motion for summary judgment, this statement, viewed in the light most favorable to Ms. Floyd, is too broad for the Court to conclude as a matter of law that Ms. Floyd provided services to Paylocity that were substantially similar to the services she provided to ADP. For purposes of Ms. Floyd's motion for summary judgment, even if the services she provided to Paylocity in her first year were

determine whether, as a matter of law, Ms. Floyd, in her first 10.5 months with Paylocity, provided services that were the same or substantially similar to the services she provided to ADP.

For purposes of this opinion, the Court does not have to resolve the issue because the evidence, viewed in the light most favorable to ADP, demonstrates that in her first 10.5 months with Paylocity, Ms. Floyd worked in areas that she previously served for ADP, targeted companies that ADP might also target, and potentially sold products that overlapped with the products she sold for ADP. That is enough to deny the parties' cross-motions for motion for summary judgment as the motions relate to the non-competition provision in ADP's restrictive covenant.

Turning to the non-solicitation provision in the restrictive covenant agreement, ADP argues that Ms. Floyd "was involved, directly or indirectly, in soliciting on behalf of Paylocity" four companies that are or were ADP clients and one company that was a prospective ADP client during Ms. Floyd's employment with ADP "in violation of the [] non-solicitation provision[]." (Doc. 89, p. 7). Mr. Fischer asserts that Blackjack Horticulture, TA Corral, Kevcor Moving, and Alabama Allergy and Asthma Center PC are or were ADP clients. (Doc. 68-10, pp.

---

not substantially similar to the services she provided to ADP, ADP has other grounds to pursue its breach of contract claim under the non-competition clause in its restrictive covenant.

2-3, ¶ 4).  Mr. Fischer asserts that Birmingham Gastroenterology "was a prospective client of ADP during Ms. Floyd's employment with ADP."  (Doc. 68-10, p. 3, ¶ 5).

As mentioned, under the non-solicitation provision of ADP's restrictive covenant, Ms. Floyd could not solicit business from companies "to whom ADP [currently] provides products or services," (Doc. 68-8, p. 18, subdivision (i)), or "to whom ADP has provided products or services within the one (1) year period prior to the termination of [Ms. Floyd's] employment with ADP," (Doc. 68-8, p. 18, subdivision (ii)).  ADP has not produced evidence that Blackjack Horticulture, TA Corral, Kevcor Moving, Alabama Allergy and Asthma Center PC, or Birmingham Gastroenterology were ADP clients when Ms. Floyd allegedly solicited their business on behalf of Paylocity, nor has ADP produced evidence that ADP provided products or services to one or more of these companies within the one-year period before ADP terminated Ms. Floyd.  Accordingly, as a matter of law, ADP has not demonstrated that Ms. Floyd violated subdivision (i) or (ii) of the non-solicitation provision.

Subdivision (iii) of the non-solicitation provision prohibits Ms. Floyd from soliciting business from companies "whom [Ms. Floyd has] solicited or contacted on behalf of ADP within the two (2) year period prior to the termination of [her] employment with ADP."  (Doc. 68-8, p. 18).  It is undisputed that Ms. Floyd solicited Blackjack Horticulture while she was working at Paylocity.  (Doc. 68-1, p. 37, tp.

141) (Ms. Floyd stated that Black Horticulture is "a client that [she has] sold at Paylocity.); (*see also* Doc. 77-6, p. 9; Doc. 84, p. 15 ("Floyd admits that she sold to [Blackjack Horticulture] while working at Paylocity.")).   In her deposition, Ms. Floyd stated as follows:

> Q.     Are you aware of whether Blackjack Horticulture, Inc., was ever an ADP customer or prospective customer?
>
> A.     I believe they may have been.
>
> Q.     Okay.  Do you remember interacting with Blackjack Horticulture when you worked for ADP?
>
> A.     I had a conversation with Tammy who had worked there.
>
> Q.     And what was the nature of that conversation?
>
> A.     To talk about ADP services, but she did not want to because the owner had heard nothing but bad things about ADP.

(Doc. 68-1, p. 38, tp. 142).  Additionally, Ms. Floyd spoke with Todd Addison from TA Corral a "handful of times" while at Paylocity, (Doc. 68-1, pp. 36-37, tpp. 137-38), because he reached out to her to request information, (Doc. 68-1, p. 37, tp. 138). While she was a sales representative with ADP, Ms. Floyd "tried to meet with" TA Corral, but they "never met with [her]."  (Doc. 68-1, p. 36, tp. 137).  Two ADP employees who reported to Ms. Floyd at ADP also tried to introduce Mr. Addison to ADP products.  (Doc. 68-1, p. 36, tp. 137).  Therefore, the record establishes that Ms. Floyd "gained knowledge of [two] potential client[s] while at ADP and directly

or indirectly solicit[ed] [those] client[s] after leaving and working for [Paylocity]." *Kusins*, 215 A.3d at 946.[12]

The record is silent, though, as to when Ms. Floyd communicated with Blackjack Horticulture or TA Corral.[13]   To establish a violation of the non-solicitation provision, Ms. Floyd must have had contact with or gained knowledge of Blackjack Horticulture or TA Corral within the two years prior to her termination, and she must have contacted them as an employee of Paylocity within the first 10.5 months of her employment with Paylocity.

ADP deposed Ms. Floyd nearly two years after the company terminated her. (Doc. 68-1, p. 2).  The record does not indicate whether Ms. Floyd, after she became a Paylocity employee, contacted Blackjack Horticulture or received a call from Mr.

---

[12] Ms. Floyd, directly or indirectly, had some involvement with Kevcor Moving, (Doc. 68-1, p. 29, tp. 108), Birmingham Gastroenterology, (Doc. 68-1, p. 37, tp. 139), and Alabama Allergy & Asthma Center PC, (Doc. 68-1, p. 37, tp. 139), while working at Paylocity.  Ms. Floyd testified that she was not involved with these companies while working at ADP.  (Doc. 68-1, p. 30, tp. 112; Doc. 68-1, p. 37, tp. 138; Doc. 68-1, p. 37, tpp. 140-41).

The only evidence that Ms. Floyd was involved with Kevcor Moving, Birmingham Gastroenterology, or Alabama Allergy & Asthma Center PC while working at ADP is Mr. Fischer's declaration that all three companies were on "Ms. Floyd's ADP account list." (Doc. 68-10, pp. 2, 3, ¶¶ 4, 5).  Even accepting Mr. Fischer's declaration as true, the fact that the companies were on Ms. Floyd's ADP account list does not mean that she "solicited or contacted [them] on behalf of ADP." (Doc. 68-8, p. 18).

[13] As noted, Ms. Floyd testified that she communicated with TA Corral while she was a sales representative at ADP.  (Doc. 68-1, p. 37, tp. 138).  Ms. Floyd was a sales representative from 2013, (Doc. 68-1, p. 6, tp. 14), until she was promoted to sales executive in 2017, (Doc. 68-1, p. 6, tp. 15).  Therefore, Ms. Floyd's contacts with TA corral almost certainly fall outside of the two-year period preceding her termination from ADP.

Addison one week, one month, one year, or nearly two years after she left ADP.  The Court will not assume that those contacts occurred within 12 months of Ms. Floyd's departure from ADP.  On the other side of the coin, Mr. Fischer stated that Blackjack Horticulture and TA Corral were "on Ms. Floyd's ADP account list during the last two years of her employment with ADP."  (Doc. 68-10, p. 3, ¶ 6).  But there is no indication in the record that Ms. Floyd "solicited or contacted [Blackjack Horticulture or TA Corral] on behalf of ADP," (Doc. 68-8, p. 18), during the last two years of her employment with ADP.  Accordingly, there is no evidence from which a reasonable jury could determine that Ms. Floyd violated the non-solicitation provision in the restrictive covenant agreement.[14]  Therefore, the Court grants Ms. Floyd motion for summary judgment as it relates to the non-solicitation provision in the restrictive covenant agreement.

### Ms. Floyd's Title VII Claims

## A. Pregnancy Discrimination Claim

"The Pregnancy Discrimination Act amended Title VII to provide that discrimination on the basis of sex includes discrimination 'on the basis of pregnancy, childbirth or related medical conditions.'"  *Holland v. Gee*, 677 F.3d 1047, 1054

---

[14] Of the four restrictions contained in the non-solicitation provision, only the last one is without a time limitation.  This clause prevents former ADP employees from soliciting clients "about whom [the former employer has] any confidential, proprietary or trade secret information." (Doc. 68-8, p. 18).  The record does not demonstrate – nor does ADP allege – that Ms. Floyd has confidential, proprietary, or trade secret information about Blackjack Horticulture or one of the other four overlapping business contacts/clients.

(11th Cir. 2012) (quoting 42 U.S.C. § 2000e(k)).  "'The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits.'"  *Holland*, 677 F.3d at 1054-55 (quoting *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000)).  In cases like this one involving circumstantial evidence, courts "apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Holland*, 677 F.3d at 1055.  "To succeed under this framework, a plaintiff must first present enough evidence to establish a *prima facie* case of discrimination; the employer then has the burden of production to articulate legitimate, nondiscriminatory reasons for the adverse employment action; and then the plaintiff must prove that those reasons were pretext."  *Sprowl v. Mercedes-Benz U.S. Int'l, Inc.*, 815 Fed. Appx. 473, 479 (11th Cir. 2020) (citing *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)).

Assuming for purposes of this opinion that Ms. Floyd can establish a *prima facie* case of pregnancy discrimination, she cannot demonstrate that ADP's legitimate, nondiscriminatory reasons for terminating her – the results of Associate Relation's investigation – were pretext and that the real reason was her pregnancy. To establish pretext, "the plaintiff must generally show that the decision maker was aware of [the plaintiff's protected classification] at the time of the adverse employment action." *Brungart v. BellSouth Telecomunications, Inc.*, 231 F.3d 791,

799 (11th Cir. 2000) (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him. As with most facts, the defendant's awareness can be established by circumstantial evidence." *Brungart*, 231 F.3d at 799.

Ms. Floyd has not produced evidence demonstrating that the ADP employees who terminated her employment with ADP were aware of her pregnancy when they decided to terminate her. During the week of March 4, 2019, Ms. Ontiveros, Mr. Cramer, and Ms. Dollins made the decision to terminate Ms. Floyd. (Doc. 68-2, pp. 16, 17, tpp. 53, 54).[15]   It is undisputed that Ms. Ontiveros did not know that Ms. Floyd was pregnant when she recommended that ADP terminate Ms. Floyd. (Doc. 68-2, p. 12, tp. 35). And there is no evidence in the record that indicates that Mr.

---

[15] During her deposition, Ms. Floyd testified that she believed that Mr. Fischer was involved in the decision to terminate her. (Doc. 68-1, p. 23, tpp. 82-83). According to Ms. Floyd, Frankie Schaffer, one of Ms. Floyd's associates, told Ms. Floyd that Mr. Fischer made the decision to terminate her. (Doc. 68-1, p. 23, tpp. 83-84). But Ms. Floyd admitted that Ms. Schaffer would not have been involved in the termination decision. (Doc. 68-1, p. 23, tp. 84). Ms. Floyd also recalled that Mr. Fischer's demeanor changed when she told him that she was pregnant. (Doc. 68-1, p. 23, tpp. 84-85).

Ultimately, Ms. Floyd's belief that Mr. Fischer was involved in the decision to terminate her amounts to unsupported speculation. Mr. Fischer testified that he was not involved in the decision to terminate Ms. Floyd. (Doc. 68-4, p. 16, tpp. 78-79). Ms. Ontiveros testified that the decision was made without Mr. Fischer. (Doc. 68-2, p. 17, tp. 54). The Court may discount a plaintiff's testimony on summary judgment if "it is blatantly contradicted by the record." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).

Cramer or Ms. Dollins knew that Ms. Floyd was pregnant when they decided to terminate her.

Ms. Floyd testified that before her termination, she told other ADP employees that she was pregnant. (Doc. 68-1, p. 53, tp. 203). But there is no evidence in the record from which reasonable jurors could infer that this information was communicated to Ms. Ontiveros, Mr. Cramer, or Ms. Dollins before they decided to terminate Ms. Floyd. The record demonstrates that by the time Ms. Floyd told Mr. Fischer that she was pregnant, ADP already had decided to terminate her. (Doc. 68-4, p. 17, tpp. 80-81). Similarly, by the time Mr. Fischer informed Mr. Cramer that Ms. Floyd was pregnant, ADP already had decided to terminate her. Because Ms. Floyd has not demonstrated that the decisionmakers were aware of her pregnancy when they decided to terminate her, Ms. Floyd cannot establish that discrimination motivated ADP's decision. Therefore, the Court grants ADP's motion for summary judgment on Ms. Floyd's pregnancy discrimination claim.

## B. Retaliation Claim

Under Title VII, it is unlawful for an employer to retaliate against an employee because the employee has opposed an unlawful employment practice or has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff asserting a retaliation claim under Title VII must establish a *prima facie* case by

showing "(1) that [he] engaged in statutorily protect conduct; (2) that [he] suffered adverse employment action; and (3) that there is 'some causal relation' between the two events." *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 Fed. Appx. 822, 829 (11th Cir. 2020) (citing *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010)).  For purposes of this opinion, the Court assumes that Ms. Floyd can establish a *prima facie* case of retaliation.[16]

Consistent with the *McDonnell Douglas* burden-shifting framework, because the Court assumes that Ms. Floyd can establish a *prima facie* case, ADP must articulate "a legitimate, non-discriminatory reason for the adverse employment action.  As with a Title VII discrimination claim, the employer's burden in a retaliation action is 'exceedingly light.'" *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989)).  ADP asserts that it filed its breach of contract claim against Ms. Floyd because she violated the restrictive covenant agreement, and the company acted to protect its legitimate interests.  This explanation satisfies ADP's burden.

The burden returns, then, to Ms. Floyd.  Ms. Floyd "must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate

---

[16] For purposes of this discussion, the Court will assume that ADP's counterclaim would qualify as an adverse action.

reasons given by the employer were not its true reasons, but were a pretext for [retaliation]." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005).   Ms. Floyd can do this by "pointing to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in ADP's stated reason for its counterclaim. *Brooks v. County Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).   A reason is not pretext for retaliation unless "'the reason was false,'" and "'retaliation was the real reason.'" *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1298 (11th Cir. 2021) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)).

To demonstrate pretext, Ms. Floyd argues that ADP's failure to file breach of contract claims against "comparators" – "Lexie Myrick, who was in the same position as [Ms. Floyd] when she left [ADP] voluntarily to work for Paylocity; Jessica Kinsley, a sales associate who worked in the Birmingham office before joining Paylocity; and Kayle Peterson, a recruiter who also left [ADP] for Paylocity" – is an inconsistency that casts doubt on ADP's proffered reason for filing the counterclaim.  (Doc. 79, pp. 28-29).  But in the summary judgment record, there is no evidence from which reasonable jurors could conclude that ADP was aware of a

possible breach of contract by Ms. Myrick, Ms. Kinsley, or Ms. Peterson.[17] Additionally, ADP has aggressively pursued litigation against many former employees who it believed violated the restrictive covenant agreement. (Doc. 90, pp. 6-7) (citing 25 cases in which ADP brought a breach of contract claim against a former employer). Accordingly, Ms. Floyd has not demonstrated that ADP treated her inconsistently.

Ms. Floyd argues that ADP's decision to sue her for breach of contract shortly after she sued the company for pregnancy discrimination suggests pretext. (Doc. 79, pp. 17-19). Ms. Floyd sued ADP for pregnancy discrimination on November 21, 2019. (Doc. 1). ADP filed its counterclaim against Ms. Floyd for breach of contract approximately six weeks later, on January 3, 2020. (Doc. 15). Ms. Floyd points out that in May of 2019, ADP learned of her employment with Paylocity and sent her a cease and decease letter, (Doc. 68-5, pp. 10-14), but the company did not sue her until after she filed her Title VII claim against ADP, (Docs. 1, 15). ADP contends that it did not sue Ms. Floyd sooner because Ms. Floyd and Paylocity assured ADP that Ms. Floyd would abide by her obligations. (Doc. 68-5, p. 2, ¶ 6). ADP contends that a December 30, 2019 LinkedIn search caused the company to learn that Ms.

---

[17] In its reply brief in support of its motion for summary judgment, ADP states that neither Ms. Myrick, Ms. Kinsley, nor Ms. Peterson signed a restrictive covenant agreement with ADP. (Doc. 90, pp. 8-9). ADP also notes that "Ms. Peterson was not a sales associate at ADP." (Doc. 90, p. 8). At the third stage of the *McDonnell Douglas* analysis, Ms. Floyd has the burden of production. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Ms. Floyd has not produced evidence demonstrating that the alleged comparators signed restrictive covenant agreements with ADP.

Floyd was, in fact, working in the same geographic territory that she covered when she worked for ADP.  (Doc. 68-5, p. 2, ¶ 5; Doc. 68-5, pp. 6-7).[18]  But ADP wrote in the company's May 2019 cease and desist letter to Ms. Floyd:  "We are particularly concerned that you have called on ADP clients in your former ADP territory to solicit their business for Paylocity."  (Doc. 68-5, p. 10).  In the letter, ADP also asked Ms. Floyd to update her LinkedIn profile, indicating that the company and its attorneys were monitoring that account.  (Doc. 68-5, p. 13).  Viewing this evidence in the light most favorable to Ms. Floyd, reasonable jurors could infer that ADP waited until nearly one year after Ms. Floyd joined Paylocity to sue her for breach of ADP's restrictive covenant because the company wished to retaliate against her for her Title VII action.

In the Eleventh Circuit, "[t]he general rule" traditionally has been "that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of

---

[18] ADP provided screenshots of Ms. Floyd's LinkedIn profile with a date of "12/30/2019" at the bottom of the webpage.  (Doc. 68-5, pp. 6-7).  ADP asserts that it "filed its Counterclaim shortly after it learned that [Ms.] Floyd was competing against ADP in the same territory as her former ADP position" and that ADP "gained this knowledge during the course of Plaintiff's lawsuit." (Doc. 90, p. 5).  ADP does not explain how it "gained this knowledge."  It does not appear that the parties exchanged initial disclosures before ADP filed its answer and counterclaim, and the Court is not aware of pre-answer discovery that would have alerted ADP to the scope of Ms. Floyd's work for Paylocity.

material fact of a causal connection." *Brungart*, 231 F.3d at 799;[19] *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). But the timing must be very close for timing alone to supply sufficient evidence of causation. *Hurlbert*, 439 F.3d at 1298 ("The close temporal proximity between Hurlbert's request for leave and his termination—no more than two weeks, under the broadest reading of the facts—is evidence of pretext, though probably insufficient to establish pretext by itself."). If timing were Ms. Floyd's only evidence of retaliatory intent, her retaliation claim would fail. Here, as in *Hurlbert*, Ms. Floyd's evidence of temporal proximity does not stand alone.

Jurors do not have to believe ADP's testimony that the company on December 30, 2019, in the thick of the winter holidays, suddenly decided to check Ms. Floyd's LinkedIn profile for the first time since May 2019 to see if she still was working for Paylocity in a territory that overlapped with the territory she served for ADP. In its May 6, 2019 cease and desist letter, ADP warned of possible litigation based on her "improper conduct" and advised her to preserve evidence. (Doc. 68-5, p. 13). Jurors could accept ADP's version of events and conclude that ADP accepted Ms. Floyd's assurance that she was not violating ADP's restrictive covenants until Ms. Floyd sued the company, and the lawsuit caused ADP to reassert its rights. Just as easily,

---

[19] "[T]here is this exception: temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart*, 231 F.3d at 799.

jurors could conclude that ADP's sudden curiosity about Ms. Floyd's work for Paylocity during the winter holidays simply is not plausible and that the only evidence of a trigger event for ADP's renewed interest in Ms. Floyd is her November 2019 lawsuit against the company. When ADP did file suit, it departed from its usual practice of suing to enforce its covenant in New Jersey per the forum selection clause in the agreement, (Doc. 15-6, pp. 19-20), and filed its breach of contract claim as a counterclaim to Ms. Floyd's Title VII claim in Alabama.

ADP argues that the Eleventh Circuit's decision in *Smith v. Miami-Dade County*, 621 Fed. Appx. 955 (11th Cir. 2015), forecloses Ms. Floyd's retaliation claim. In *Smith*, the plaintiff sued her former employer under the Americans with Disabilities Act and the Fair Credit Reporting Act, and her former employer "then filed a counterclaim, alleging that [the plaintiff's] suit was a breach of the parties' worker's compensation settlement agreement," in which the plaintiff "agree[d] not to bring any suit, claim, demand, action or litigation in any forum or court . . . on any issue or matter or cause arising or allegedly arising out of . . . employment." *Smith*, 621 Fed. Appx. at 957, 960 (internal quotation marks, record citations, and emphasis omitted). Ms. Smith "subsequently amended her complaint, alleging that [the employer's] counterclaim was unlawful retaliation for her discrimination suit." *Smith*, 621 Fed. Appx. at 957.

The district court granted the employer's motion to dismiss the plaintiff's retaliation claim, and the Eleventh Circuit affirmed. *Smith*, 621 Fed. Appx. at 960. The Eleventh Circuit held that a plaintiff asserting a retaliation claim based on an employer's lawsuit or counterclaim "must allege that the lawsuit or counterclaim was filed with a retaliatory motive and was lacking a reasonable basis in fact or law." *Smith*, 621 Fed. Appx. at 960.[20]  Similarly, in *DeMartini v. Town of Gulf Stream*, the Eleventh Circuit stated that "the presence of probable cause [to initiate a lawsuit or counterclaim] will generally defeat a § 1983 First Amendment retaliation claim based on a civil lawsuit as a matter of law."  942 F.3d 1277, 1304 (11th Cir. 2019).

The Eleventh Circuit has "not considered whether the existence of probable cause [to initiate a lawsuit or counterclaim] would [] defeat a Title VII retaliation claim that is founded on the filing of a civil lawsuit."  *Tolar*, 997 F.3d at 1292.  In *Tolar*, the Eleventh Circuit decided to "leave resolution of the question whether *DeMartini* applies to a Title VII retaliation claim for another day," *Tolar*, 997 F.3d at 1293, but dicta in *Tolar* suggests that the Eleventh Circuit may be inclined to extend *DeMartini* to a Title VII retaliation claim.  In *Tolar*,

> Plaintiffs further contend that the Bank engaged in [litigation] because it wanted to retaliate against a relative of the Plaintiffs, which relative had engaged in protected conduct under Title VII when she claimed to be the victim of sexual harassment by a Bank official. In addressing this

---

[20] The Eleventh Circuit stated that "merely alleging that [the employer] will ultimately lose on the merits is different than alleging that [the employer] had no reasonable basis in fact or law to file a counterclaim in the first place."  *Smith*, 621 Fed. Appx. at 960.

> claim, the first question one might ask is whether the filing of a
> purportedly legitimate lawsuit—or motion in a lawsuit—can itself
> subject the initiator of that action to suit by the person he sued, on the
> ground that the initiator's motive for filing the pleading in question was
> itself impure. One might wonder why, if the defendant has a valid cause
> of action against the plaintiff, he should not be permitted to sue—
> utilizing all tools available to effectuate that suit—regardless of the
> motivation prompting the decision to sue. After all, it is presumably the
> rare lawsuit that is brought with warm-hearted notions in mind.
>
> In addition, plumbing the complex set of considerations that likely
> accompany any decision to initiate litigation is a very uncertain task,
> requiring an examination of not just subjective motivations, but also
> objective legal assessments.

*Tolar*, 997 F.3d at 1292.  Other courts of appeals have concluded that a Title VII

retaliation claim ordinarily may not rest on an employer's decision to file a

counterclaim against a Title VII plaintiff.  *Hernandez v. Crawford Bldg. Material

Co.*, 321 F.3d 528, 532-33 (5th Cir. 2003) ("[A]n employer's filing of a counterclaim

cannot support a retaliation claim in the Fifth Circuit."); *Grimsley v. Charles River

Laboratories, Inc.*, 467 Fed. Appx. 736, 738 (9th Cir. 2012) (finding that even if

"counterclaims may be actionably retaliatory in 'rare cases,' such as when they have

no basis in law and fact and were filed with retaliatory [intent]," the plaintiff's

retaliation claim should be dismissed "because [the employer's] counterclaims did

have an arguable basis in law and fact"); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d

1106, 1123 (10th Cir. 2007) (affirming the district court's grant of summary

judgment on the plaintiff's retaliation claim because, "[m]ost importantly, [the

plaintiff] has not shown . . . that [the employer's] counterclaims are devoid of

merit"); *Berrada v. Cohen*, 792 Fed. Appx. 158, 164 (3d Cir. 2019) ("Courts holding that a counterclaim can be an adverse action require that the counterclaim be 'baseless.'").

Here, ADP ultimately may lose its counterclaim on the merits, in part because ADP may not be able to demonstrate an injury even if it successfully proves a technical violation of the non-competition provision in its restrictive covenant. But ADP's counterclaim against Ms. Floyd has a "reasonable basis in fact or law," especially with respect to the non-competition provision in ADP's restrictive covenant. *Smith*, 621 Fed. Appx. at 960. Accordingly, because the Court believes the Eleventh Circuit will extend the rationale of *DeMartini* to Title VII retaliation claims, the Court grants ADP's motion for summary judgment on Ms. Floyd's Title VII retaliation claim.

## CONCLUSION

For the reasons discussed above, the Court enters judgment for ADP on Ms. Floyd's Title VII pregnancy discrimination and retaliation claims. The Court denies Ms. Floyd's and ADP's cross-motions for summary judgment on ADP's breach of contract claim as it relates to the non-competition provision in ADP's restrictive

covenant.  By separate order, the Court will set ADP's breach of contract claim for trial.[21]

**DONE** and **ORDERED** this August 30, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[21] The Court denies ADP's motion to strike, (Doc. 82), as moot because it did not rely on Ms. Floyd's declaration at Doc. 71-1 in deciding the summary judgment motions.